UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON


UNITED STATES OF AMERICA and the STATE OF WEST VIRGINIA,
by and through the
WEST VIRGINIA DEPARTMENT OF ENVIRONMENTAL PROTECTION and
PENNSYLVANIA DEPARTMENT OF ENVIRONMENTAL PROTECTION and
COMMONWEALTH OF KENTUCKY, by and through the
KENTUCKY ENERGY AND ENVIRONMENT CABINET,

      Plaintiffs,

v.                        Civil Action No. 2:14-11609


ALPHA NATURAL RESOURCES, INC. and
ALPHA APPALACHIA HOLDINGS, INC.
ALEX ENERGY, INC. and ALPHA PA COAL TERMINAL, LLC
AMFIRE MINING COMPANY, LLC and ARACOMA COAL CO., INC. and
BANDMILL COAL CORP. and BELFRY COAL CORP. and
BIG BEAR MINING CO. and BROOKS RUN MINING COMPANY, LLC and
BROOKS RUN SOUTH MINING LLC and CLEAR FORK COAL CO.
CUMBERLAND COAL RESOURCES, LP, and DELBARTON MINING CO. and
DICKENSON-RUSSELL COAL COMPANY, LLC and DUCHESS COAL CO. and
EAGLE ENERGY, INC. and ELK RUN COAL CO., INC. and
EMERALD COAL RESOURCES, LP and ENTERPRISE MINING COMPANY, LLC
and GOALS COAL CO. and GREYEAGLE COAL CO. and
HARLAN RECLAMATION SERVICES LLC and
HERNDON PROCESSING CO., LLC and HIGHLAND MINING CO. and
INDEPENDENCE COAL COMPANY, INC. and JACKS BRANCH COAL CO. and
KANAWHA ENERGY CO. and KEPLER PROCESSING CO., LLC and
KINGSTON MINING, INC. and KINGWOOD MINING CO., LLC and
KNOX CREEK COAL CORP. and LITWAR PROCESSING CO., LLC and
MARFORK COAL CO. and MARTIN COUNTY COAL CORP. and
NEW RIDGE MINING CO. and OMAR MINING CO. and
PARAMONT COAL COMPANY VIRGINIA, LLC and
PAYNTER BRANCH MINING, INC. and PEERLESS EAGLE COAL CO. and
PERFORMANCE COAL CO. and PETER CAVE MINING and
PIGEON CREEK PROCESSING CORP. and PIONEER FUEL CORP. and
POWER MOUNTAIN COAL CO. and PREMIUM ENERGY, LLC and
RAWL SALES & PROCESSING CO. and RESOURCE DEVELOPMENT, LLC and
RESOURCE LAND CO. and RIVERSIDE ENERGY CO., LLC and
ROAD FORK DEVELOPMENT CO. and ROCKSPRING DEVELOPMENT, INC. and
RUM CREEK COAL SALES, INC. and SIDNEY COAL CO. and
SPARTAN MINING CO. and STIRRAT COAL CO. and

SYCAMORE FUELS INC. and TENNESSEE CONSOLIDATED COAL COMPANY and TRACE CREEK COAL CO. and TWIN STAR MINING, INC.,

       Defendants

## MEMORANDUM OPINION AND ORDER

      Pending is the United States' motion to enter the proposed consent decree and its addendum, filed June 13, 2014.

I.

A.   Procedural Background

      Defendants' coal mining operations are subject to National Pollutant Discharge Elimination System ("NPDES") permits inasmuch as they discharge water at multiple points throughout their mining operations.  These discharges emanate from various impoundments and settlement ponds, outlets, ditches, and other conveyances that qualify as "point sources" emitting "pollutants" as those two terms are defined under federal law for Clean Water Act ("CWA") purposes.

      The NPDES permits at issue here contain effluent limits for multiple pollutants, including aluminum, iron, manganese, osmotic pressure, pH, selenium, and total suspended

2

solids.  The limits are drawn from technology-based standards set by EPA and water quality-based standards set by the state of West Virginia.

Alpha Appalachia Holdings, Inc., previously Massey Energy Company ("Massey"), and its subsidiaries, have at times failed to comply with the CWA.  On May 10, 2007, the United States sued Massey and its subsidiaries for discharges of pollutants into waters of the United States in violation of Section 301 of the CWA and violations of the conditions and limitations of certain NPDES permits.  The claims against Massey and its subsidiaries included over 5,100 NPDES permit violations and over 250 additional violations of NPDES permit conditions or unpermitted water discharge-related violations.

On April 9, 2008, the court approved and entered a consent decree ("Massey CD") resolving the claims alleged in the May 10, 2007, complaint.  The Massey CD was designed to address a long history of NPDES permit limit violations at Massey coal mining operations.  It imposed a series of auditing, data management, and violation response requirements.  Massey operations, however, continued to accrue numerous violations of NPDES permit limits.  The EPA undertook an investigation of Massey's failure to comply.  Over a period of three years, EPA

3

gathered and analyzed data from Massey and state regulators, inspected numerous Massey facilities, and met repeatedly with Massey senior corporate officials regarding its compliance record.

The investigation resulted in EPA issuing Massey notices of noncompliance for violations of paragraphs 43 (quarterly reports), 27(d) (violation response), and 39 (stream restoration) of the Massey CD.  EPA additionally determined that measures beyond those required by the Massey CD would be necessary to ensure compliance.  On May 31, 2011, the United States Department of Justice notified Massey that EPA had referred claims for CWA violations against the company for potential legal action.  Massey was invited to engage in pre-filing negotiations.

Also following entry of the Massey CD, several of its subsidiaries were subject to additional enforcement efforts for continuing pollutant discharges in violation of their NPDES permits.  In April 2010, citizen groups instituted an action against five of Massey's subsidiaries for violations of effluent limitations based on its self-reported Discharge Monitoring Reports ("DMRs").  See Ohio Valley Environmental Coalition, ("OVEC") v. Elk Run Coal Company, 2:10-cv-00673 (S.D. W. Va.

Apr. 27, 2010).  On August 8, 2011, the court entered a consent
decree addressing the claims.  In June 2010, the same citizen
groups instituted another civil action against two of Massey's
subsidiaries for violations of selenium limits based on the
subsidiaries' self-reported DMRs.  See OVEC v. Independence Coal
Company, Inc. and Jacks Branch Coal Company, 3:10-cv-0836 (S.D.
W. Va. Jun. 17, 2010).  On January 24, 2012, the court entered a
consent decree addressing the claims.  The subsidiaries,
however, have continued to discharge pollutants in violation of
their NPDES.


        On June 1, 2011, Alpha Natural Resources, Inc.
("Alpha") acquired Massey.  Alpha began negotiations with the
United States shortly thereafter on the CWA claims against the
former Massey operations.  EPA had already begun separate
investigations into Alpha's own CWA compliance history by that
point.  The negotiations thus broadened to cover both entities
and their respective subsidiaries.  Ultimately, West Virginia,
Pennsylvania, and Kentucky joined in the discussions as well.

        Over the ensuing two and a half years, exhaustive
negotiations occurred, with plaintiffs all the while continuing
their investigations of the CWA noncompliance at Alpha.  These
included additional site inspections, two separate requests for

5

information under Section 308 of the CWA, analysis of available state permitting and enforcement data, and resort to the scientific and technical resources independently available to the federal and state sovereigns.  Both sides hired consultants, were represented by experienced counsel, met multiple times, exchanged dozens of draft consent decrees, thousands of emails and letters, and innumerable phone calls.

During this same time period of investigation and negotiation, the United States engaged citizen groups.  The United States had multiple conversations with Appalachian Mountain Advocates regarding continuing CWA violations at the prior Massey operations.  The United States received multiple notices of intent to sue ("NOIs") from citizen groups for claims overlapping those that were part of the negotiations between the enforcement agencies and the defendants.  The United States provided the citizen groups with notice of its negotiations in advance of any citizens' complaint.  The citizen groups were also offered opportunities to provide input concerning the injunctive relief portions of the proposed consent decree. In each instance, the citizen groups chose to institute actions.

It is noteworthy, however, that two of the citizen suits with claims overlapping some of the claims here made were

voluntarily dismissed with prejudice after lodging of the proposed consent decree discussed infra.  See OVEC v. Alex Energy, Inc., 2:12-03412 (S.D. W. Va. May 23, 2014); OVEC v. Marfork Coal Company, Inc., 5:12-cv-01464 (S.D. W. Va. May 23, 2014).  Another case is presently stayed pending the disposition of this matter.  See Citizens Coal Council v. Emerald Coal Resources, LP, 2:13-00003 (W.D. Pa. Jun 10, 2014).


B.   The Instant Enforcement Action


The United States, on behalf of the EPA, the West Virginia Department of Environmental Protection, the Pennsylvania Department of Environmental Protection ("PADEP"), and the Commonwealth of Kentucky (collectively, "plaintiffs"), instituted this action pursuant to section 309(b) and (d) of the CWA, 33 U.S.C. §§ 1319(b) and (d), section 22 of the West Virginia Water Pollution Control Act ("WPCA"), West Virginia Code section 22-11-22, sections 601 and 605 of the Pennsylvania Clean Streams Law ("PCSL"), 35 Pennsylvania Statutes sections 691.601 and 691.605, and Kentucky Revised Statutes Chapter 224, Kentucky Revised Statutes section 224.99.

Based on self-reported information from the defendants, the complaint alleges over 6,200 violations of applicable effluent limits at defendants' coal mining operations over the past six years, as well as unpermitted discharges from two outfalls associated with the Cumberland Mine in Pennsylvania.  Plaintiffs thus allege that the defendants have violated Section 301 of the CWA, 33 U.S.C. § 1311, West Virginia Code § 22-11-8, 35 Pennsylvania Statutes sections 691.301, 691.307, 691.315, and Kentucky Revised Statutes section 224.70-110.  The United States and the PADEP also allege that Alpha and Cumberland Coal Resources, LP, have violated 33 U.S.C. § 1311 and 35 Pennsylvania Statutes sections 691.301, 691.307, and 691.315 by discharging pollutants into waters of the United States and the Commonwealth without an NPDES permit.

Plaintiffs seek permanent injunctive relief and civil penalties against defendants to address the unlawful discharges. The court is vested with subject matter jurisdiction under section 309(b) of the CWA, 33 U.S.C. § 1319(b), and 28 U.S.C. §§ 1331, 1345, 1355, and 1367.

On September 10, 2014, the court entered an order requesting further information on multiple matters found in the proposed consent decree.  The parties have filed their joint

8

position statement on those matters, which are reflected in the table below:

| Citation | Matter Raised | Joint Response |
|---|---|---|
| Page 6, Para. 9 | Please provide an explanation respecting why Sections VIII and IX are the only two Sections specifically mentioned as continuing obligations in the event of a transfer of ownership.  Why is a transferee not required to (1) Expressly assume (2) All of the obligations of the Consent Decree applicable to the transferor. Further, please specify the nature of the referenced "related obligations" mentioned in the paragraph. | The matter was the subject of intensive negotiations. Selenium and osmotic pressure violations are more difficult to address than conventional violations.  The transferee need not assume the obligations to implement sections VIII and IX inasmuch as those obligations will remain binding on defendants regardless of transfer.  Transferees would remain subject to NPDES permitting constraints and other CWA requirements, including applicable penalties and injunctive relief. These and other factors resulted in the compromise struck in Paragraphs 9 and 10, which was integral to reaching settlement as a whole.  The referenced "related obligations" include a number of provisions outside of sections VIII and IX. Some specifically reference the selenium and osmotic pressure requirements and others do not.  Examples are offered by the parties for each. |

| | | |
|---|---|---|
| Page 63, Para. 108 | The matter of authorized persons should be addressed here, along with a requirement that the waiver be in writing and otherwise in compliance with any applicable public notice and other procedural requirements. | The parties have agreed to add the following provision: "Any Plaintiff may, in the unreviewable exercise of its discretion, reduce or waive stipulated penalties otherwise due to that Plaintiff under this Consent Decree. The reduction or waiver of stipulated penalties shall be made in writing by an authorized person on behalf of that Plaintiff." |
| Page 65, Para. 115 | Please advise if either Tennessee or Virginia need to be considered in the percentage breakdown? | Tennessee and Virginia both declined participation in this enforcement proceeding. They are thus not included in Paragraph 115 as recipient of stipulated penalties relating to enforcement of Consent Decree obligations. |
| Page 70, Para. 131 | Why, if the Dispute Resolution procedures are "the exclusive mechanism to resolve disputes arising under or with respect to" the Consent Decree, there is mention later of the potential for an enforcement "action" by the United States or the state sovereigns. Additionally, please explain whether the states are authorized to pursue independent enforcement actions under the Consent Decree without joinder of the United States. | Plaintiffs may move to enforce the Consent Decree if the defendants are unresponsive or otherwise fail to initiate Dispute Resolution. Any plaintiff is authorized to pursue an independent action to enforce the Consent Decree, though it is anticipated that they would first coordinate with their fellow sovereigns. |

| Page 71, Para. 132 | Please explain whether, at line three, the phrase "the States" should instead read "the affected States." This same alteration should be considered where necessary under Paragraph 133. | The parties agree to the proposed modification. |
|---|---|---|
| Page 71, Para. 134 | Please explain whether provision should be made for an affected state to serve a Statement of Position? | The plaintiffs have agreed that the United States, following consultation, takes the lead in the Dispute Resolution process. The state sovereigns thus agree that it is unnecessary for them to serve their own Statement(s) of Position. |
| Page 72, Para. 137a | This paragraph covers dispute resolution relating, <u>inter</u> <u>alia</u>, to the "adequacy of the performance of work undertaken pursuant to" the Consent Decree. That phrase should be drafted with more precision. It is a bit vague in its present form. | The parties have considered whether the language could be made more precise. They were unable to identify any changes that would preserve the intentionally broad coverage of the original phrase without potentially carving out unforeseen categories of dispute that should otherwise be afforded record review. They note "a number of courts" have used the language in other consent decrees without development of significant issues relating thereto. |
| Page 77, Para. 153 | "[D]ue but not paid by Defendants" should instead read "due hereunder but not paid by Defendants." | The parties agree to the proposed modification. |

| | | |
|---|---|---|
| Page 81, Para. 161 | The word "consistent" found in line five of this paragraph seems unnecessary.  The parties should consider omitting it. | The parties agree to the proposed modification. |

The parties have submitted a proposed order encompassing the agreed upon modifications noted above.  They additionally contend that the changes do not substantively alter any of the proposed injunctive relief and that no additional public notice or comment period is necessary.  The court agrees.

C.   The Proposed Consent Decree

On March 5, 2014, the United States lodged a proposed consent decree covering the claims in this action.  The proposed consent decree is the product of five years of investigation and negotiations between the defendants and federal and state regulators.  The proposed consent decree contains two principal categories, namely, a civil penalty and injunctive relief.

The civil penalty is in the amount of $27.5 million. It is the largest civil penalty ever assessed through either settlement or litigation for NPDES permit violations.  It exceeds the EPA's calculated economic benefit, discussed more fully _infra_.  It was arrived at after assessing a number of

12

factors, including economic benefit, the extent and environmental impact of the alleged violations, penalties assessed in similar settlements, and the plaintiffs' assessment of the litigation risk associated with their claims.  The sum will be divided between the United States, West Virginia, and Kentucky.  The cost of the injunctive relief is said by the parties to be nearly $200 million.

The proposed injunctive relief consists of three main components: (1) general injunctive relief, (2) selenium-related injunctive relief, and (3) osmotic pressure injunctive relief.[1] The general injunctive relief provisions include, among multiple other components, an Environmental Management System ("EMS"). An EMS is a systematic, planned, and documented strategy to aid in the implementation of a top-down, prevention-focused approach to CWA issues.  Alpha will be required to hire a third-party consultant to develop and implement the EMS and then retain a second consultant 11 months later to audit whether the EMS has been properly implemented.

The selenium-related injunctive relief includes 11 specific compliance plans covering 28 outfalls currently not in

---

[1] Osmotic pressure estimates the effect of dissolved constituents in the water, such as salts, on aquatic life.

13

compliance with selenium limits.  The plans include water management and treatment approaches, such as redirecting storm water, diluting wastewater, and moving the point of discharge to a water body with greater assimilative capacity.

The treatment systems required by the proposed consent decree successfully treat selenium to below applicable limits. Each plan has a specific deadline, the latest of which is December 1, 2014. Five of the water management approaches have already been successfully implemented, and design and permitting requirements are ongoing for others.  The continued violation of selenium limits will result in per diem and monthly violation penalties in the respective amounts of $8,000 and $15,500.

The osmotic pressure injunctive relief requires wastewater collection and treatment system that will ensure compliance with both existing and future effluent limits.  There are also specific deadlines for interim milestones and an overall compliance deadline of September 30, 2016.  Defendants' implementation efforts are well underway in order to meet the applicable deadlines.

On March 11, 2014, the United States published a Notice of Lodging of the Consent Decree in the Federal Register, triggering a 30-day public comment period.  The applicable West

14

Virginia state public comment period concluded on May 12, 2014.
The parties have not disclosed any applicable comment period for
either Pennsylvania or Kentucky.  Interested members of the
general public were given over 60 days to comment on the
proposed consent decree.  During that time, the United States
and West Virginia received less than 10 non-duplicate comments.

Following the lodging, the Commonwealth of Virginia
sought to participate in information gathering and enforcement
efforts against Alpha's mining facilities there.  The parties
have thus now submitted a proposed consent decree addendum that
requires defendants to (1) submit certain reports and
notifications to the Virginia Department of Mines, Minerals and
Energy that are already to be sent to plaintiffs, (2) permit
access to an audit and violations database to be maintained by
Alpha pursuant to the proposed consent decree, and (3) apportion
the stipulated penalties for effluent limit violations that
occur in Virginia between the United States and Virginia.  The
addendum does not affect, alter, or amend the injunctive relief
requirements of the proposed consent decree and no further
public notice and comment is required.

D.    The Comments Received


        The United States is correct that the comments
received can be summarized under five headings as follows: (1)
whether the proposed consent decree can ensure compliance given
the continuing violations coming after the Massey CD, (2)
whether injunctive relief applicable to the Emerald Mine,
including osmotic pressure injunctive relief, is sufficient to
ensure compliance, (3) whether the civil penalty is appropriate
in amount, (4) whether defendants should be required to direct
part of the civil penalty money to stream restoration efforts,
and (5) whether the United States must take a legal position on
the impact of the proposed consent decree on future violations
and enforcement efforts.

        The court has reviewed and considered all of the
comments.  Some constitute unhelpful general attacks on the
sufficiency of the proposed accord.  Others merit more scrutiny.
For example, the comments of Sarah Surber are directed primarily
toward the amount of the penalty and the apparent failure of the
Massey CD.

        Regarding the penalty amount, the United States
applied the Interim Clean Water Act Settlement Penalty Policy

(CWA Penalty Policy), which is publicly available on the
Internet.  The CWA Penalty Policy contains a methodology for
calculating penalties under these circumstances.  In his
declaration accompanying the United States' materials, Chad
Harsh, a Lead Environmental Scientist in EPA Region 3, discusses
at length how he arrived at the penalty figure, which focuses on
the calculation of economic benefit gained by the violator in
its compliance failures and the gravity of the violations.  Mr.
Harsh's extended explanation of his process for arriving at the
amount is reasoned and supported.  One factor influencing the
strength of the penalty is defendants' response to it during
negotiations, as set forth in Mr. Harsh's declaration:

> Alpha vigorously contested EPA's economic benefit
> calculations during negotiations. Alpha hired a third
> party consultant that disagreed with the methodology
> used by EPA and Industrial Economics, and argued that
> economic benefit was significantly lower than
> EPA's calculation. EPA did not agree with Alpha's
> expert, and ultimately the civil penalty in the
> CD recovered all of EPA's calculated economic benefit.

(Harsh Decl. at 27).  The court is satisfied that the historic
penalty amount withstands scrutiny.

Ms. Surber's concerns respecting the apparent failure
of the Massey CD are of greater significance.  The following
excerpt crystallizes the concern:

> Th[e proposed consent decree] does nothing to address
> the problems of the previous Consent Decree with

17

Massey —— there are no assurances that the EPA, DOJ,
or the states will enforce future violations. As my
article in Environmental Justice (attached) addressed,
the DOJ did not monitor violations after the Consent
Decree was signed. It did not make public the
information that Massey/Alpha continued to
increasingly violate the CWA after the Consent Decree.
It kept information in a scattered, unorganized manner
that took months to produce after my FOIA request.
Massey/Alpha paid very little for later violations in
non-negotiable stipulated penalties even though it
continued to violate. Massey was supposed to implement
an electronic monitoring program, but there is no
evidence that this program improved water quality. In
fact, this lack of attention allowed Massey/Alpha to
continue to violate and violate more often! This
Consent Decree requires a similar electronic
monitoring that did not work in the prior Consent
Decree. It does not place any duty on the states, DOJ,
or EPA to stop and penalize illegal pollution easily
recognized from the DMR data. Because this Consent
Decree fails to address problems of the past that led
to these current CWA violations, I object to the
Consent Decree.

(Objec. of Sarah Surber at 3).


The objection carries significant weight given the

history of violations coming after the Massey CD.  The United

States, however, notes, in part, as follows:

EPA expended significant effort and resources in
monitoring compliance with the Massey CD,
investigating noncompliance, and taking action to
compel compliance. The proposed CD, which is a product
of those efforts, is much different than the Massey CD
and based on lessons learned from implementation of
the Massey CD as well as implementation of the
successful Patriot and Arch CDs. . . . [T]he
injunctive relief requirements are significantly more
robust and quickly escalate to requiring third party
experts to identify remedies to return to compliance.
The CD requires Alpha to develop a compliance focused

18

> EMS based on the same elements as in the Arch and
> Patriot CDs, which have proven successful.
> Initial treatment system audits will ensure that
> proper treatment system[s] are in place and maintained
> from the start. The stipulated penalties are increased
> and apply to all effluent limit parameters. Required
> internal and third party environmental audits will
> ensure the EMS is implemented and producing the
> intended results. Finally, the record keeping and
> reporting wi[ll] make it easier for EPA and the states
> to monitor compliance than previously experienced
> under the Massey CD. This combination of more
> stringent compliance measures and stipulated
> penalties, increased internal accountability, greater
> third party involvement, and additional measures to
> facilitate state and federal compliance monitoring
> provides a strong framework for Alpha to ensure
> compliance with its NPDES permits.

(Decl. of Mr. Harsh at 34-35).  The response is sufficient to allay the well-taken concerns expressed by the commentator.  The court concludes likewise with respect to the balance of the comments received.  The comments do not constitute an obstacle to approval.


                              II.


         Our court of appeals has observed that "a consent decree 'has elements of both judgment and contract,' and is subject to 'judicial approval and oversight' generally not present in other private settlements." Szaller v. American Nat. Red Cross, 293 F.3d 148, 152 (4th Cir. 2002) (quoting Smyth v. Rivero, 282 F.3d 268, 279-80 (4th Cir. 2002)); see also Local

                              19

No. 93, Int'l Assn. of Firefighters, AFL-CIO v. Cleveland, 478 U.S. 501, 519 (1986); United States v. ITT Continental Baking Co., 420 U.S. 223, 237 n.10 (1975) (citation omitted); Alexander v. Britt, 89 F.3d 194, 199 (4th Cir. 1996).

It has expanded upon this principle in Smyth, observing that a court is expected, when presented with a proposed consent decree, to scrutinize the accord and make certain findings prior to entry:

Because it is entered as an order of the court, the terms of a consent decree must also be examined by the court. As Judge Rubin noted in United States v. Miami,

Because the consent decree does not merely validate a compromise but, by virtue of its injunctive provisions, reaches into the future and has continuing effect, its terms require more careful scrutiny. Even when it affects only the parties, the court should. . . examine it carefully to ascertain not only that it is a fair settlement but also that it does not put the court's sanction on and power behind a decree that violates Constitution, statute, or jurisprudence.

664 F.2d at 441 (Rubin, J., concurring). In other words, a court entering a consent decree must examine its terms to ensure they are fair and not unlawful.

Smyth, 282 F.3d at 280.

The standards governing consideration of a proposed consent decree are described further by United States v. North

20

<u>Carolina</u>, 180 F.3d 574, 581 (4th Cir. 1999):

> In considering whether to enter a proposed consent
> decree, a district court should [1] be guided by the
> general principle that settlements are encouraged.
> Nevertheless, a district court should not blindly
> accept the terms of a proposed settlement. <u>See</u> <u>Flinn
> v. FMC Corp.</u>, 528 F.2d 1169, 1173 (4th Cir.1975).
> Rather, before entering a consent decree the court
> must satisfy itself that [2] the agreement "is fair,
> adequate, and reasonable" and [3] "is not illegal, a
> product of collusion, or against the public interest."
> <u>United States v. Colorado</u>, 937 F.2d 505, 509 (10th
> Cir. 1991). In considering the fairness and adequacy
> of a proposed settlement, the court <u>must assess the
> strength of the plaintiff's case. See Flinn</u>, 528 F.2d
> at 1172-73. While this assessment does not require the
> court to conduct "a trial or a rehearsal of the trial,"
> <u>the court must take the necessary steps to ensure that
> it is able to reach "an informed, just and reasoned
> decision."</u> <u>Id.</u> (internal quotation marks omitted). In
> particular, the "court should consider <u>the extent of
> discovery that has taken place, the stage of the
> proceedings, the want of collusion in the settlement
> and the experience of plaintiffs' counsel who
> negotiated the settlement."</u> <u>Carson v. American Brands,
> Inc.</u>, 606 F.2d 420, 430 (4th Cir. 1979) (en banc)
> (Winter, Circuit Judge, dissenting), adopted by <u>Carson
> v. American Brands, Inc.</u>, 654 F.2d 300, 301 (4th Cir.
> 1981) (en banc)(per curiam).

<u>Id.</u> at 581 (emphasis supplied).


III.


As noted in <u>North Carolina</u>, the court accepts the
general proposition that settlements are encouraged.  The
consideration is especially <u>apropos</u> in this action, which

appeared poised to consume a significant amount of time and
expense by the parties, including the public fisc, along with a
substantial redirection of judicial and governmental resources.

       Regarding fairness, adequacy, and reasonableness,
there has been no formal discovery.  There has, however, been
approximately five years of investigation, study, and
negotiation.  No one challenges the following summary by the
United States:

        As laid out [by a Lead Environmental Scientist at EPA
        Region 3] . . . the Consent Decree was reached only
        after several years of investigations and nearly three
        additional years of negotiations.  Plaintiffs'
        negotiations were informed by certified responses
        provided by Defendants in response to multiple
        information requests under Section 308 of the CWA;
        multiple technical meetings with and reports from the
        Defendants and their experts; information provided by
        enforcement programs within the [states of] West
        Virginia, Kentucky, and Pennsylvania; input from
        experienced scientists within the relevant government
        agencies; input from expert consultants hired by the
        United States; and multiple site visits and
        inspections at facilities owned and operated by
        Defendants. . . . Moreover, while not required to do
        so, the United States gave interested citizen groups
        an opportunity to provide input on injunctive relief
        measures on multiple occasions before lodging, and
        assessed the comments received in determining the
        appropriateness of the proposed settlement.

        In addition, negotiations were conducted by
        qualified counsel for each party, and both sides
        relied on technical staff and third-party experts in
        developing their proposed settlement terms.  Many
        issues were vehemently contested, and over the years
        of negotiations there were multiple in-person meetings

> along with thousands of phone calls and emails,
> resulting in the exchange of dozens of proposed
> injunctive relief drafts.

(U.S. Memo. in Supp. at 14-15) (citations omitted).  As in

<u>United States v. Patriot Coal Corp.</u>, No. 2:09-0099, 2009 WL

1210622 (S.D. W. Va. Apr. 30, 2009), "plaintiffs seem to have

developed, without the need for extensive litigation, a

substantial case to support the relief requested in the

complaint." <u>Id.</u> at *5.

     It is noteworthy as well that the proposed consent

decree is sponsored, in part, by the federal and state

environmental regulators in their respective spheres authorized

by Congress, the Legislature, and the Commonwealths with

enforcing various federal and state water quality laws.  As in

<u>Patriot Coal</u>,

> The EPA and DEP are governmental agencies that employ
> individuals specially trained and familiar with the
> relevant scientific disciplines and governing law.
> The decision to avoid what might well have been a
> costly and time-consuming diversion of limited agency
> resources appears to have been a reasonable one under
> the circumstances.

<u>Id.</u>

     Considering the applicable factors, the federal and

state sovereigns have negotiated a comprehensive approach to

alleviating a large-scale, long-term environmental degradation.

They have done so without the expense, delay, and misallocation of litigation resources that might otherwise have occurred during protracted, hard-fought, and complex litigation.

The court, accordingly, finds that the proposed consent decree and addendum serve the public interest and are fair, adequate, and reasonable and, further, that they are neither illegal nor the product of collusion.  In view of these findings, and inasmuch as no person has herein opposed entry of the proposed consent decree and addendum, the court ORDERS as follows:

1. That the United States' unopposed motion to enter the proposed consent decree and its addendum be, and it hereby is, granted;

2. That the proposed consent decree and addendum be, and hereby are, entered this same date; and

3. That this action be, and hereby is, dismissed and stricken from the docket, with the court retaining jurisdiction pursuant to Article XVIII of the consent decree and any other provision therein contemplating the potential for future action by the court.

24

The Clerk is requested to transmit this written opinion and order to all counsel of record and to any unrepresented parties.

DATED:  November 26, 2014

John T. Copenhaver, Jr.
United States District Judge